WILLIAM J. COOPER, Respondent, v. UTAH LIGHT & RAILWAY COMPANY, a Corporation, Appellant, and UTAH LIGHT & POWER COMPANY, a Corporation, Respondent.

No. 2005.   Decided April 29, 1909 (102 Pac. 202).

1. CORPORATIONS—POWER TO SELL PROPERTY. As a general rule, a corporation having no public duties to perform has the same power as an individual to sell, with the consent of its stockholders, all of its property, including its privileges and franchises, except its franchise to be a corporation. (Page 581.)

2. CORPORATIONS—SALE OF PROPERTY—RIGHTS OF CREDITORS. A corporation has no more right than an individual to dispose of its property to the prejudice of creditors. (Page 582.)

3. CORPORATIONS—SALE OF PROPERTY AND FRANCHISE—LIABILITY OF PURCHASER TO CREDITORS OF SELLER. As a general rule, a corporation which has succeeded by purchase to the property and franchise of another corporation is not liable, merely by reason of its succession, for the general debts or on the general contracts of the selling corporation. (Page 582.)

4. CORPORATIONS—TORTS—LIABILITY OF SUCCESSOR TO PROPERTY AND FRANCHISES. A corporation is not liable for the negligence or other torts of another corporation to whose property and franchises it has succeeded. (Page 582.)

5. CORPORATIONS—RIGHTS OF CREDITORS. A general creditor has no lien on the funds of a solvent corporation, and the right of such corporation to deal with its property is absolute, so long as it does not violate its charter, or the laws applicable to such a corporation. (Page 582.)

6. CORPORATIONS—NATURE AND MEANING OF "FRANCHISE." The term "franchise" when applied to corporations has various significations, both in a legal and popular sense, and has two well-defined meanings, one pertaining to what is sometimes called the "primary franchise," or the right to exist as a corporation, and the other to the different rights, privileges, and powers which are obtained and exercised by the corporation, and which are not a prerequisite to corporate existence, such as, among others, the right or privilege to occupy and use streets and public places for the operation of a system of water or gasworks, electrical lighting plants, railroads, etc. (Page 583.)

7. CORPORATIONS—POWER TO SELL FRANCHISE. Unless the right is given by the power creating it, a corporation cannot sell its primary franchise, or its right to exist as a corporation; but, in the absence of any constitutional or statutory restriction, it may sell what is denominated its "secondary franchise," or its right to occupy and use streets and public places for the operation of its work. (Page 583.)

8. CORPORATIONS—POWERS TO SELL "ANY FRANCHISE." In Const. art. 12, sec. 7, declaring that "no corporation shall lease or alienate any franchise so as to relieve the franchise or property held thereunder from the liabilities of the lessor or grantor, lessee or grantee, contracted or incurred in operation, use or enjoyment of such franchise or any of its privileges," the word "any" means any one of a number, and "any franchises" include all franchises, both primary, or the right to exist, and secondary, or such as the right to occupy and use streets and public places for the operation of its works, as distinguished from the corporate property of the corporation. (Page 584.)

9. CORPORATIONS—SALE OF FRANCHISE "OR PROPERTY HELD THEREUNDER"—CONSTITUTIONAL RESTRICTIONS. In Const. art. 12, sec. 7, declaring that no corporation shall lease or sell any franchise so as to relieve the franchise or property held thereunder from certain corporate liabilities, the words "or property held thereunder" mean such property as is necessarily held and used in the operation, use, or enjoyment of the privileges and rights conferred by the franchise, and without the possession of which property the rights and privileges conferred or granted by the franchise could not successively be exercised, operated, or enjoyed. (Page 588.)

10. CONSTITUTIONAL LAW—CONSTRUCTION OF CONSTITUTIONAL PROVISIONS. In the construction of a constitutional provision, the proceedings of the constitutional convention may be considered in determining the meaning of the terms used. (Page 599.)

11. CORPORATIONS—SALE OF FRANCHISE AND PROPERTY—LIABILITY OF PURCHASER—CONSTITUTIONAL PROVISIONS. Const. art. 12, sec. 7, declares that "no corporation shall lease or alienate any franchise so as to relieve the franchise or property held thereunder from the liabilities of the lessor or grantor, lessee or grantee, contracted or incurred in the operation, use or enjoyment of such franchise or any of its privileges." *Held* that a corporation exercising the right to occupy and use the streets and public places for the operation of an electric light and power plant, and a street railway, under a franchise granted by the city, cannot convey such franchise so as to relieve the property used in

the exercise thereof from liability for a judgment obtained for personal injuries to an employee in the operation of such property. (Page 589.)

12. Corporations—Sale of Franchise and Property—Liabilities of Purchaser. Independent of Const. art. 12, sec. 7, restricting the right of corporations to convey their franchises and property so as to relieve the same from certain liabilities, but under the general principles of equity, the creditor of a corporation, having a judgment for personal injuries to him while an employee, is entitled to have the property of the judgment debtor, including its franchises, subjected to the payment of such judgment, as against another corporation purchasing after the injury for which the judgment was recovered, where the only consideration paid by the purchaser was the issuance and delivery of stock, which was distributed to the stockholders of the selling corporation. (Page 591.)

13. Corporations—Sale of Corporate Property—Rights of Creditors. Where the consideration is adequate, a creditor of a selling corporation cannot complain of the transfer of corporate property on the ground that the consideration received was not paid in cash, but was other valuable property, unless he is otherwise injured or prejudiced. (Page 592.)

14. Corporations—Sale of Corporate Property—Rights of Creditors. A corporate creditor may complain when the selling and purchasing corporations enter into an agreement whereby all the property of the selling corporation is to be conveyed on a consideration, whether cash, shares of stock, or other property, which is not to be paid and received as assets and property of the selling corporation, but which is to be distributed among its stockholders. (Page 592.)

15. Corporations—Division of Stock—Validity. Under Comp. Laws 1907, sec. 4411, making it a misdemeanor for corporate directors or managers "to divide, withdraw or in any manner except as provided by law pay to the stockholders or any of them any part of the capital stock of the corporation," a transaction whereby one corporation transfers all its property and franchises, except the franchise to exist as a corporation, to another corporation on an agreement that the consideration of the transfer should be distributed to the stockholders of the selling ' corporation, is, as to creditors of the selling corporation, not only fraudulent, but unlawful. (Page 592.)

16. Corporations—Division of "Capital Stock"—Validity. In Comp. Laws 1907, sec. 4411, making it a misdemeanor for corporate directors or managers "to divide, withdraw or in any

manner except as provided by law, pay to any stockholders or any of them any part of the capital stock of the corporation," the term "capital stock" means the capital of the corporation on which it transacts business, whether such capital consists of money, property, or other valuable commodities. (Page 593.)

17. FRAUDULENT CONVEYANCES—CREDITORS' SUIT—PLEADING. A complaint to subject to the payment of a judgment property which has been conveyed by the judgment debtor, which alleges facts and transactions constituting fraud in law, is sufficient, though such transactions are not therein characterized as fraudulent. (Page 594.)

18. JUDGMENT—COLLATERAL ATTACK. A judgment of a court having jurisdiction of the subject-matter and of the parties is, in the absence of fraud, conclusive on collateral attack as to the relation of debtor and creditor and the amount of the indebtedness, not only as between the parties, but as to third persons in a subsequent action in which such relation and indebtedness are called in question. (Page 595.)

APPEAL from District Court, Third District; *Hon. C. W. Morse,* Judge.

Action to subject property to the payment of judgment. From a judgment for plaintiff, the defendant, the Utah Light & Railway, appealed.

AFFIRMED.

*P. L. Williams, Geo. H. Smith, Jno. G. Willis* and *H. B. Thompson* for appellant.

*Henderson, Pierce, Critchlow & Barrette* for respondent Cooper.

APPELLANT'S AUTHORITIES.

The rule with respect to the liability of a purchasing corporation for the debts of a vendor corporation is stated by Clark & Marshall on Corporations, sec. 342, vol. 2, page 985, as follows: "As a general rule, a separate and distinct corporation which has succeeded by a valid purchase and transfer to the property and franchises of another corporation,

is not liable, merely by reason of its succession, for the general debts or on the general contracts of the other corporation. It is not liable at all for such debts or on such contracts, in the absence of a special agreement to pay or assume the same, nor is the property in its hands liable to be subjected to the same, in the absence of a valid lien, thereon, unless it affirmatively appears that the transfer of the property and franchises of the other corporation constitutes in fact or in law, a fraud upon its creditors, or the circumstances attending the creation of the new corporation, and its succession to the property and franchises of the old corporation are such as to warrant a finding that it is in reality a mere continuation of the old corporation." (*Austin v. Bank,* 49 Neb. 412; *Bruffet v. Railroad,* 25 Ill. 353; *Morgan County v. Thomas,* 76 Ill. 120; *Donnally v. Hearndon,* 41 W. Va. 519; *Water Co. v. Magens,* 15 Lea [Tenn.] 37; *McLeLand v. File Works,* 56 Mich. 579; *Chase v. Telephone Co.,* 121 Mich. 631; *Railroad v. Griest,* 85 Ky. 619; *Smith v. Canal Co.,* 14 Pet. [U. S.] 45; *Railroad v. Shirley,* 54 Tex. 125; *Hooper v. Moore,* 42 Ia. 563; *Warfield v. Canning Co.,* 2 Am. St. 263; *Railroad v. Newell,* 73 Tex. 334, 15 Am. St. 788; *Ewing v. Brake Shoe Co.,* 169 Mass. 72; *Railroad v. Fisher,* 21 Am. St. 189; *Huggins v. Brewing Co.,* 10 Wash. 579; *Pennison v. Railroad,* 93 Wis. 344; *Foundry and Pipe Works v. Water Supply Co.,* 105 Wis. 48.) There is no presumption that obligations are assumed. This must be affirmatively proven. (Clark & Marshall on Corp., pp. 990, 993, 995; *Am. v. Mills,* 52 Ill. 274; Cook on Corp., secs. 675, 890; *Austin v. Bank,* 49 Neb. 412.) Liability depends either upon fraud or assumption. (*Reed Bros. Co. v. Bank,* 46 Neb. 169.) A corporation which purchases all the property of another corporation is not liable for the debts of the latter. This is the general rule stated in Cook on Corporations (4th Ed.), sec. 673. (*Gray v. National S. S. Co.,* 115 U. S. 116 [1885].) A railroad corporation which purchases the property of another railroad corporation is not liable, upon the dissolution of the latter, for a tort committed by it. (*Railroad v. Griest,* 85 Ky. 619; *Batterson v. Railroad,* 53 Mich. 125;

*Goldmark v. Metal Co.*, 60 N. Y. Sup. 425, 63 N. E. 1117 [N. Y. 1899]; *Port Gibson v. Moore*, 21 Miss. 157; Morris on Priv. Corp. (2 Ed.), sec. 808 *et seq.; Shaw v. Railroad,* 82 Mass. 407; *Austin v. Bank*, 35 L. R. A. 444 [Neb.]; Penna Transp. Cos. Appeal, 101 Pa. St. 576; *Smith v. Railroad*, 18 Wis. 17; *Neff v. Boom Co.*, 50 Wis. 585; *Railroad v. Shirley*, 54 Texas 125; *Bank v. Lockwood*, 2 Harr. [Del.] 8; *Menasha v. Railroad*, 52 Wis. 414; *Railroad v. Griffin,* 92 Ind. 487; *Gilman v. Railroad*, 37 Wis. 317; *Sappinglon v. Railroad*, 37 Ark. 23; *Cook v. Railroad*, 43 Mich. 349; *Rathbun v. Snow*, 123 N. Y. 343; *Donnally v. Hearndon,* 41 W. Va. 519; *Campbell v. Bank*, 49 Neb. 143; *Ewing v. Brake Shoe Co.* [Mass.], 47 N. E. 341; *Fernschild v. Brewing Co.*, 15 N. Y. App. Div. 29 afd., 154 N. Y. 667.) The trust fund theory was founded upon, and in all well considered cases has been decided upon, fraudulent transactions inspired by a fraudulent intent to injure either specific creditors or those of a particular class; and, as stated by Clark & Marshall, *supra,* it can have no application in this suit in view of the absence of a showing of fraud. As stated by Clark & Marshall, sec. 342, vol. 2, page 1000: "The true ground of liability wherever, as a matter of law the corporations are not the same, is fraud either in fact or in law." (*Ins. Co. v. Iron Co.*, 13 Fed. 516; *Blanc v. Mining Co.*, 95 Cal. 533; *Chase v. Telephone Co.*, 121 Mich. 631, 80 N. W. 714.) Judgments are not binding upon those who acquired their interest in the subject-matter of the suit prior to the commencement thereof. *Caroll v. Goldschmidt*, C. C. A. N. Y., 83 Fed. 508, 509, citing *Ingersoll v. Jewett,* 16 Blatch 378, (Fed. Cases, No. 7039) to the effect that: "No one is privy to a judgment whose succession to the rights of property thereby affected occurred previous to the institution of the suit." (*Railroad v. Missouri*, 152 U. S. 314; *Hassall v. Wilcox*, 130 U. S. 494; *Dull v. Blackman*, 169 U. S. 248; *Gage v. Parker* [Ill.], 53 N. E. 317; *Moreland v. Frick*, 32 Atl. [Pa.] 634; *Bensimer v. Fell*, 12 S. E. 1078; *Garrard v. Hull*, 20 S. E. [Ga.] 357; *Hodge v. Hodge*, 34 S. E. 517; *Roulston v. Hall*, 50 S. W. [Ark.] 690; *Brocket v. Railroad,*

61 N. W. 405.) If defendants' title or interest attached before suit brought they are not bound unless they were made parties. (Black on Judgments, sec. 549, pp. 831, 832, sec. 606; *Dull v. Blackman,* 169 U. S. 243; *Cook v. Lasher,* 73 Fed. 701; *Bennett v. Gray,* 36 N. Y. Suppl. 372; *Moreland v. Frick Co.,* 32 Atl. 634; *Bensimer v. Fell,* 12 S. E. 1078; *Morrison's Admr. v. Mullin,* 34 Pa. 12; *Brockert v. Railroad,* 61 N. W. 405.)

RESPONDENT'S AUTHORITIES.

The conveyance by one corporation to another in consideration of stock in the vendee is not a transfer for value, but is one which may be attacked by creditors of the vendor as in fraud of their rights. It is a voluntary conveyance. (2 Cook on Corp. [5 Ed.], secs. 673-4; 5 Thomp. Corp., sec. 6542; 2 Clark & Marshall Corp., sec. 342, i. j.; 10 Cyc., 1264 *et seq.; Cole v. Iron Co.,* 133 N. Y. 164; *Grenell v. Gas Co.,* 112 Mich. 70; 70 N. W. 413; *Schible v. Ardner,* 98 Mich. 70, 56 N. W. 1105.) The judgment against the Utah Light & Power Company, establishing the fact that the respondent was a creditor of that corporation and the amount of its indebtedness is binding upon the Utah Light & Railway Company, where, as in this case, it is determined that the latter is not a holder either in good faith or for value. (*Candee v. Lord,* 2 N. Y. 269, 51 Am. Dec. 294; 23 Cyc. Law and Proc., 1286; *Decker v. Decker,* 108 N. Y. 128; *Ledoux v. Bank,* 48 N. Y. Supp. 782; *Bank v. Hagemeyer,* 38 N. Y. Supp. 626; *Strong v. Lawrence* [Ia.], 12 N. W. 74; *Sidensparker v. Sidensparker* [Me.], 83 Am. Dec. 527; *Bensimer v. Fall,* 29 Am. St. 774; *Weaver v. Haviland,* 142 N. Y. 534, 40 Am. St. 631; *Grocer Co. v. Richesin,* 91 Fed. 80.)

STRAUP, C. J.

This is an equitable action, brought by plaintiff to subject certain property conveyed and transferred by the Utah Light & Power Company, a corporation, to the Utah Light & Railway Company, a corporation, to the satisfaction of a

judgment obtained by the plaintiff against the first-named company. The case was submitted to the court below principally upon an agreed statement of facts. The statement, and findings of the court, so far as material, show: Both corporations are domestic corporations. The Utah Light & Power Company was organized in 1899, and from that time until January 2, 1904, when the conveyance and transfer was had, was engaged in the business of producing and furnishing, for industrial, commercial, and domestic purposes, light and power to the inhabitants of Salt Lake City, and to various municipal and private corporations in Salt Lake and other counties of the state. That for the purpose of carrying on such business it held, used, enjoyed, and was seised and possessed of, certain franchises or licenses granted by Salt Lake City, by virtue of which it had the right and privilege to occupy and use the streets and public places of Salt Lake City to there erect poles and maintain wires for the purpose of conducting electricity and electric currents. These franchises are particularly described in the complaint and findings. That in the use and enjoyment of these franchises the Utah Light & Power Company, from 1899 until January 2, 1904, "held, owned, used, possessed, and enjoyed certain real and personal property necessary and convenient to the business by it carried on under and in the operation of said franchises." The personal property described consisted of horses, wagons, tools, office furniture, safes, books, electrical instruments, electric light meters, "and other electrical devices of great value." The real property described consisted of several parcels of land situated in Salt Lake City, and "electric generating or power stations" maintained and operated on such lands, and by means of which stations "the Utah Light & Power Company generated the currents of electricity so by it carried or conducted through and upon its lines of wire maintained by it under the privilege of and franchises granted by the city of Salt Lake," and "power houses with generators, engines, boilers, and other machinery," also maintained and operated on such lands, and that all such property was "used as aforesaid by the said Utah Light & Power Com-

35 Utah—37

pany in connection with, and for the purposes of, the enjoyment of the franchises hereinbefore described." That on January 2, 1903, "while the Utah Light & Power Company so held, used, enjoyed, and operated the franchises, and the real and personal property" heretofore referred to, "and while it was engaged in the operation of its machinery and generators in furnishing and supplying currents of electricity to be carried upon and over the streets of Salt Lake City as aforesaid, it so used, maintained, and operated the same, and particularly the machinery, currents, and circuits of wire maintained at" one of its stations, "as to cause to the plaintiff serious bodily injury, whereby the Utah Light & Power Company became and was liable to the plaintiff in a large sum of money." That on the 13th day of October, 1905, the plaintiff commenced an action in the district court of the Third judicial district against the Utah Light & Power Company "to enforce the liability of said defendant to plaintiff for the injuries so suffered and sustained by him," and that, on its appearance in the action, such proceedings were had as resulted in plaintiff obtaining a judgment against it on the 24th day of January, 1907, in the sum of ten thousand, thirty-one dollars and sixty cents. That on or about the 2d day of January, 1904, the Utah Light & Railway Company was organized "for the purpose of acquiring all the property, real, personal, and mixed, of the Utah Light & Power Company, and particularly all the franchises, rights, and privileges theretofore held and enjoyed by said Utah Light & Power Company, including the property, real and personal, and the franchises hereinbefore set forth," and on that day the Utah Light & Power Company conveyed and transferred to the Utah Light & Railway Company "all of said real and personal property theretofore by said grantor [the Utah Light & Power Company] used, held, and enjoyed, and including the real and personal property and franchises hereinbefore particularly mentioned, set forth, and described." That such conveyance and transfer "was made without any consideration of any sort whatsoever, save and except the transfer and allotment by the said Utah Light & Railway Company to the said

Utah Light & Power Company of three million, sixty-two thousand and five hundred shares of the capital stock of the Utah Light & Railway Company," and that, as stated in the agreed statement of facts, "the said consideration expressed in the said deed [of conveyance] was in accordance with an agreement theretofore entered into between the Utah Light & Power Company and the Utah Light & Railway Company, and ratified by the vote of the stockholders of the Utah Light & Power Company, whereby it was provided that the said Utah Light & Power Company should be sold and transferred to the Utah Light & Railway Company, in consideration of the said number of shares [3,062,500] of the Utah Light & Railway Company. That the said number of shares were the same as the entire subscribed and outstanding number of shares of the Utah Light & Power Company; the said agreement being that the said shares so received from the Utah Light & Railway Company should be distributed to the shareholders in the Utah Light & Power Company, share for share; and that the stock so delivered by the Utah Light & Railway Company was so distributed to the stockholders of the Utah Light & Power Company in accordance with said agreement." That the Utah Light & Railway Company immediately entered into the possession, use, and enjoyment, and has ever since held the possession, use, and enjoyment, and has and does claim title to all of the real and personal property and franchises, rights, and privileges, theretofore enjoyed by the Utah Light & Power Company, including all the real and personal property and franchises mentioned and described in the complaint and in the findings. That the Utah Light & Power Company is not the owner of any property, real, personal, or mixed, or of any franchises, upon which an execution may be levied, "or out of which may be made on execution the sum of money so due and owing from the Utah Light & Power Company to the plaintiff," and that all the shares of stock received as and for the consideration for the conveyance and transfer were distributed to the various stockholders of the Utah Light & Power Company, and thus placed beyond the levy of process under plaintiff's

judgment. That an execution was issued on such judgment, and was returned wholly unsatisfied. That when the conveyance and transfer were made, the general attorney, general manager, electrical engineer, and assistant engineer of the Utah Light & Power Company had actual knowledge of the existence of plaintiff's claim, "and each of said employees and officers was at the same time, and continued thereafter to be, officers and employees in the same capacity of the Utah Light & Railway Company, and the president and secretary of the Utah Light & Power Company were at the same time, and continued thereafter to be, the president and secretary, respectively, of the Utah Light & Railway Company." That at the time of the conveyance and transfer the real and personal property of the Utah Light & Power Company was incumbered by certain mortgages securing outstanding bonds of the nominal or par value of $3,350,000 theretofore issued by the Utah Light & Power Company and its predecessors in interest, and since the transfer the Utah Light & Railway Company gave a further mortgage or trust deed, to secure an issue of bonds amounting to one million, four hundred eighty-eight thousand dollars, outstanding, upon all the property and assets acquired by it from the Utah Light & Power Company, and upon other property acquired by it from another corporation.

Upon these facts the trial court held that the Utah Light & Railway Company is not, as against plaintiff's claim, a holder, in good faith for value and without notice, of any of the property acquired by it from the Utah Light & Power Company, and that the conveyance and transfer so made are as to him void and of no effect, and that he is entitled to levy upon and sell any or all of such property, or sufficient thereof as is necessary to satisfy the amount due on his judgment had against the Utah Light & Power Company. From the judgment rendered in this action the Utah Light & Railway Company has prosecuted this appeal.

It insists (1) that the transaction as alleged and found by the court shows, not a consolidation, but a sale; (2) that the franchises referred to in the complaint, and in the findings, and which were conveyed and transferred, do not in-

clude the franchise of the selling corporation to be a corporation, but only such franchises and privileges as were granted by Salt Lake City to use the streets and public places; (3) that the plaintiff's claim was not a lien on any of the property conveyed (the conveyance being made January 2, 1904, and plaintiff's action not commenced until October 13, 1905, and judgment not had until January 24, 1907), and that the selling corporation had the right to sell and transfer, for value, all its property and assets of every kind and description, and all its privileges and franchises, except the franchise to be a corporation, the same as a natural person, and that, in the absence of an agreement to assume and pay the unsecured debts and liabilities of the selling corporation, neither the purchasing corporation nor the property so acquired by it is liable for such debts and liabilities, except on a plea and proof of fraud; (4) that it is not alleged in the complaint, nor found by the court, that the selling corporation was insolvent, nor that the conveyance was fraudulent; and (5) that the court failed to find on a material issue raised in appellant's answer, wherein it was alleged that the appellant was not made a party to the action in which plaintiff obtained the judgment on account of his injuries, and was given no opportunity to defend against the claim, and that it should not in this action be concluded by the judgment so had.

The respondent's right to recover is based, and the judgment of the court below is defended by him, on two theories: (1) That by virtue of a constitutional provision the Utah Light & Power Company could not lawfully make the conveyance and transfer, so as to relieve the franchises and the property so conveyed and in the hands of the purchasing company from the selling corporation's liability upon which plaintiff's judgment was founded; and (2) that upon the general principles of equity the purchasing company, under the agreed statement of facts and the findings, held the property and the franchises conveyed subject to, and charged with, such liability.

As a general rule, a corporation having no public duties to perform has ordinarily the same power to

sell, with the consent of its stockholders, all its property, including its privileges and franchises, except its franchise to be a corporation, that an individual has. It may not, however, any more than an individual, dispose of its property to the prejudice of creditors. And it may be said that, "as a general rule, a separate and distinct corporation, which has succeeded, by a valid purchase and transfer, to the property and franchises of another corporation, is not liable, merely by reason of its succession, for the general debts or on the general contracts of the other corporation. It is not liable at all for such debts or on such contracts, in the absence of a special agreement to pay or assume the same, nor is the property in its hands liable to be subjected to the same, in the absence of a valid lien thereon, unless it affirmatively appears that the transfer of the property and franchises of the other corporation constitutes, in fact or in law, a fraud upon its creditors, or the circumstances attending the creation of the new corporation, and its succession to the property and franchises of the old corporation, are such as to warrant a finding that it is in reality a mere continuation of the old corporation." (2 Clark & M. on Corps., section 342.) In such case a corporation is not liable for the negligence or other torts of another corporation to whose property and franchises it has succeeded. A general creditor has no lien upon the funds of a solvent corporation, and the right of such a corporation to deal with its property is absolute, so long as it does not violate its charter or the laws applicable to such a corporation. (*McDonald, Receiver, v. Williams,* 174 U. S. 397, 19 Sup. Ct. 743, 43 L. Ed. 1022.)

The provision of the state Constitution to which we are referred reads as follows:

"No corporation shall lease or alienate any franchise, so as to relieve the franchise or property held thereunder from the liabilities of the lessor, or grantor, lessee, or grantee, contracted or incurred in operation, use or enjoyment of such franchise or any of its privileges." Article 12, sec. 7.

With respect to this provision several questions arise: What is meant by the word "franchise," the words "property held thereunder," and "liabilities . . . contracted or incurred in operation, use or enjoyment of such franchise or any of its privileges?" By some courts it has been held that the term "franchise," when applied to a corporation, technically speaking, means only the franchise to be a corporation, and does not include those rights and privileges, subsidiary in their nature, acquired by the corporation, and to the existence of which corporate existence is not a prerequisite. But it is quite generally recognized by courts that the term, when applied to corporations, has various significations, both in a legal and popular sense, and has especially two well-defined meanings; one pertaining to what is sometimes called the "primary franchise," the right to exist as a corporation, and the other to the different rights, privileges, and powers which are obtained and exercised by the corporation, and which are not a prerequisite to corporate existence, such as, among others, the right or privilege to occupy and use streets and public places for the operation of a system of water or gasworks, electrical lighting plants, railroads, etc. (3 Words & Phrases; 19 Cyc. 1451.) Such a meaning has been given the term by this court. (*Blackrock Copper M. & M. Co. v. Tingey,* 34 Utah 369, 98 Pac. 180.) Unless the right is given the corporation by the power creating it, the corporation may not sell the primary franchise; but, in the absence of constitutional or legislative restrictions, it may sell what has been denominated "secondary franchises." While the complaint and the findings, in effect, show that the purchasing corporation organized to acquire, and that it did acquire, all the franchises and all the property of the selling corporation, nevertheless, counsel for both parties have treated the complaint and the findings as showing not an alienation of the franchise to be a corporation, and we shall likewise so treat them.

The appellant contends that the word "franchise," as used in the Constitution, refers only to the franchise to be a corporation. The case of *Bailey & Wife v. Southern Ry. Co.,*

110 Ky. 231, 61 S. W. 31, lends some support to such a
contention. The Constitution there was, in every material
respect, identical with ours. The court there said: "The
word 'franchise,' as here used, is the corporate existence or
charter privileges, as distinguished from the corporeal prop-
erty of the corporation. The words 'or property held there-
under' have reference to such public duty, obligations, or
servitude as may be imposed, by virtue of the 'franchise,' on
the tangible property of the corporation." If by this lan-
guage the court meant to hold that the term "franchise," as
used in the Constitution, means only the franchise to be a cor-
poration, and does not include other or secondary franchises,
which also are incorporeal hereditaments, we cannot agree
with the Kentucky court. If, however, it meant to hold that
the term means rights and privileges "as disinguished from
the corporeal property of the corporation," we agree with
that court. The right or privilege granted to a corporation
to occupy and use streets and public places for the purpose
of carrying on a system of gas or electric light works is in-
corporeal, and, in both a legal and popular sense, is a fran-
chise. The language of the Constitution is: "No corpora-
tion shall lease or alienate any franchise so as to,"
etc. The word "any" here means any one of a num-
ber, and the words "any franchise" include all fran-
chises. (Words and Phrases.) To give the Constitution any
other meaning is not to give language its ordinary meaning.
And when the words "such franchise or any of its privileges"
are also considered and given effect, it is quite clear that the
framers of the Constitution meant to restrict an alienation of
something more than the mere franchise to be a corporation.

The Constitution of the state of Washington is also iden-
tical with ours. In speaking of it that court in the case of
*Klosterman v. Mason Co., etc., R. R. Co.*, 8 Wash. 281, 36
Pac. 136, said: "This is but a declaration of what the courts
have generally held to be the law, irrespective of constitu-
tional limitations or provisions. (*Chicago, etc., Ry. Co. v.
Chicago Third Nat. Bank*, 134 U. S. 276. 10 Sup. Ct. 550,
33 L. Ed. 900.)" But we do not think that there is anything

in the law, or this provision of the Constitution, which inhibits a corporation from voluntarily transferring property for the payment of debts for which the property so transferred is legally bound." In that case the entire property of the corporation, consisting of a mill, with appurtenances, lands, and a railroad, costing in the neighborhood of one hundred and twenty-five thousand dollars was mortgaged to secure an indebtedness of fifty thousand dollars. The corporation was also indebted to a person named Mason in the sum of ten thousand dollars which indebtedness was unsecured. Being unable to pay its debts, it sold all its property to Mason in consideration of such indebtedness, and the payment of twelve hundred dollars in cash. Klosterman, the plaintiff, was a creditor of the corporation, and held a claim against it in the sum of three hundred dollars for goods sold and delivered. The deed of conveyance purported to convey all the property of the corporation and all franchises and privileges. While the court there held that the property acquired by Mason was not subject to plaintiff's claim, nevertheless the case was not ruled on the theory that the Constitution referred only to a franchise to be a corporation, nor that plaintiff's claim was not a liability contracted or incurred in the operation, use, or enjoyment of a franchise or privilege. The case was ruled on the theory that the Constitution was only a declaration of what courts held to be the law, irrespective of constitutional limitations, and that since the property, as shown by the evidence, was not at the time of the sale, of greater value than the mortgage indebtedness, the Constitution did not inhibit a transfer of it for the payment of the debts for which the property was legally bound. We think the case was rightly decided, for, among other reasons, it was not there made to appear that the liability was contracted or incurred in the operation, etc., of any franchise or privilege. But we cannot agree with that court that the Constitution is but a declaration of what the courts held to be the law, irrespective of constitutional limitations, for, in the absence of legislative or constitutional restrictions, courts have generally held that a

solvent corporation may, in the ordinary course of business, and with the assent of its stockholders, sell for value, all its property, including its secondary franchises, and that the purchaser takes it freed from all unsecured liabilities of the grantor, whether contracted or incurred in operation, use, or enjoyment of any franchise or privilege, or otherwise, and that the creditors may assail the transaction only on the ground of fraud and prejudice. Of course the holding of the courts has not been that an insolvent corporation may do more than a solvent one. The Constitution has placed some restrictions upon the alienation of franchises so as to relieve the franchise or property held thereunder from certain liabilities, though unsecured, of the grantor, regardless of value or good faith, or the solvent condition of the corporation; and to that extent, at least, the constitutional provision is a modification of what courts held to be the law in the absence of constitutional or legislative restrictions.

As already indicated, we are of the opinion that the words "any franchise," as used in the Constitution, include all franchises, both primary and secondary, and "as distinguished from the corporeal property of the corporation." It is quite clear that the proceedings of the constitutional convention, to which appellant has referred us, show that the framers of the Constitution did not use the term "franchise" in the sense of a mere right to be a corporation. Pro. Const. Conv., pp. 1655-1658. It there appears that Mr. Thurman, a member from Utah county, suggested that the word "lease" ought to be stricken from the section. He said: "The reason for that is this: You take a franchise, say like a street railway, and if the corporation had not a right to lease the franchise for a given number of years to raise money upon it without the franchise being liable for debts incurred, in the operation or enjoyment of the franchise, it would effectually exclude them from leasing it. I think they ought not to have the power to grant it absolutely." On a motion to strike the entire section Mr. Evans, a member from Weber county, in opposition to the motion, said: "If a corporation can lease its franchises and its property, and thereby relieve itself of

individual liability, the persons who might be injured in the operation of the corporation would be without remedy. Now, let me bring to your mind an illustration. Take any of these transcontinental railways that have charters, and let them lease those rights to other companies, and suppose the companies to whom they are leased are impecunious; they have nothing—simply leasing the road and the rolling stock and all the property connected with it. If any liability should occur by reason of the operation of those roads while in the possession of the lessee, there would be no remedy whatever to enforce a judgment which might be obtained. The lessee would be penniless. The corporation would own the property. It could not be touched, and the result would be that every man who was injured, or every man who made a contract with the lessee, would be without a remedy. That is just exactly what this section is intended to prevent." Mr. Maloney, also of Weber county, said: "Take, for instance, the Oregon Short Line, which is a branch of the Union Pacific System. The Union Pacific is in the hands of a receiver. Where, I ask any gentleman of this convention, is there a remedy for a man who has contracted with this railway? The people along the line are simply helpless. I am not able to see any good reason for striking this out. The lessee should be held responsible; and, when the lessee is operating the road, the property should be held responsible." In reply to Mr. James, of Salt Lake, that the section would prevent mining companies from leasing their properties without becoming responsible for all liabilities of the lessee while operating the property, Mr. Thurman said: "Do you not understand that a mine or a farm, or any property of that kind, is not a franchise? . . . Franchise is a mere right to act, to enjoy a privilege"—and by Mr. Maloney that "the section does not cover mining property, and was never intended to." We are aware that these expressions may be regarded as the meaning only which these particular members of the convention placed upon the section in question, and that they do not necessarily express the meaning of the body of the convention. But, so

far as they may be noticed, they make against, and not for, the appellant.

While the Constitution places a restriction on the leasing or alienation of any franchise, yet the restriction is not so broad as to prevent a sale of property of the corporation, other than franchises, unless the property is held under a franchise. In a sense it may be said that all property, real and personal, acquired and possessed by the corporation, is held under some franchise, either its right to be a corporation, or under other rights and privileges subsidiary thereto, obtained and acquired by the corporation. But that is not the sense in which the words "or property held thereunder" are used. To so hold is to hold that a corporation cannot sell anything so as to relieve the thing sold from the liabilities of the corporation "contracted or incurred in operation," etc. It of course is conceded by all courts that the powers and privileges which constitute the franchises of a corporation, while in a just sense property, are yet distinct and separate from the corporeal property which, by the use of such franchises, the corporation may acquire and hold; that is to say, the general property, real and personal, acquired and held by the corporation is not, in any sense, a franchise, and is not embraced within that term, and it is not so regarded by the law, nor by common acceptation.

The meaning of the words in the Constitution "or property held thereunder"—under a franchise—is not clear. It is, however, our duty to give them, if possible, some meaning and effect. The Kentucky court held that they referred to "such public duty, obligation, or servitude as may be imposed by virtue of the 'franchise' on the tangible property of the corporation." Just what is intended by this language is also not very clear. We are of the opinion that the meaning intended to be given these words by the framers of our Constitution is such property as is necessarily held and used in the operation, use, or enjoyment of the privileges and rights conferred by the franchise, and without the possession of which property the rights and privileges conferred or granted by the franchise could not successfully

be exercised, operated or enjoyed. If we are permitted to notice the proceedings of the constitutional convention—and we think we are—(*Sanipoli v. Pleasant Valley Coal Co.*, 31 Utah 114, 86 Pac. 865), we think it there fairly appears that the words were so used, and that such a meaning was intended. By giving them such a construction the meaning of the words "liabilities, etc., contracted or incurred in operation, etc., of such franchise or any of its privileges" is also made reasonably clear and harmonious; that is to say, the Constitution does not restrict the alienation of a franchise so as to relieve the franchise, or property held thereunder, from all liabilities of the grantor, but only such as are "contracted or incurred in operation, use, or enjoyment of such franchise, or any of its privileges."

So construing the Constitution, we are of the opinion that its provisions restricted the alienation of the franchises held by the Utah Light & Power Company, and which were granted by the municipality, to occupy and use the streets and public places so as to relieve such franchises, or any property held thereunder—property which was necessarily held and used in the operation, use, or enjoyment of the rights and privileges conferred by such franchises, and which property was necessary to successfully operate, use, or enjoy such rights or privileges—from the liabilities of such company contracted or incurred in operation, etc. Such holding not only includes such franchises, but also the poles and wires erected and maintained in the streets and public places of the city, for such property was necessary to the use and enjoyment of the rights and privileges granted by the municipality, and without which such rights and privileges could not successfully have been exercised and enjoyed. However, were it not for the direct recitals contained in the agreed statement of facts, and upon which the findings of the court are based, we would be much inclined to the opinion that neither the stations, power houses, engines, boilers, nor other machinery used in generating or manufacturing electricity, nor the real estate upon which they were situated, nor any of the personal property described in the findings, would be property held

under the franchises granted by the municipality, for the reason that it might well be said that all such property was held separate from, and independent of, the particular franchises referred to, and had its existence wholly independent thereof. While it may be said that the stations and power houses and machinery were necessary to manufacture or generate the electricity which was conducted along the wires on the poles placed in the streets under the franchises, yet the granting of the franchises to use the streets for the purpose of erecting and maintaining poles and wires to conduct electricity was not necessary to the right or privilege to manufacture or generate electricity, nor to produce or sell it as a commercial product. The corporation could have engaged in such business, and could have acquired and held its plant, machinery, and real estate, and all the personal property mentioned in the findings, and could even have conducted and delivered electricity to consumers, wholly independently of the franchises granted by Salt Lake City. But it could not have used the streets and public places of the city for such purposes, and could not have erected and maintained poles and wires in the streets, without the granting of the franchises or privileges by the city. But the parties by their agreed statement of facts, have, in direct terms, agreed and stated that the personal property, the real estate, the stations and power houses, and all machinery, etc., mentioned and described in the statement and in the findings, were held under, and were used and possessed in the use and enjoyment, and were necessary and convenient in the operation of such franchises. Upon such agreed statement of facts, the court below so found. Because of such statement, and of the findings, we are constrained to hold that all such real estate and personal property sold were necessary in the operation of the franchises granted by the municipality, and hence were property held under such franchises. Likewise the parties have, in effect, by their agreed statement of facts, stipulated and agreed that the claim, upon which plaintiff's judgment against the Utah Light & Power Company was founded, was a liability incurred in the operation of such franchises. We are therefore

of the opinion that the selling corporation, by reason of the constitutional provision, could not alienate the franchises referred to so as to relieve them and the property mentioned and described in the findings from the selling corporation's liability with respect to plaintiff's claim and the judgment subsequently obtained by him.

We are also of the opinion, that, independently of the constitutional provision, the plaintiff, under the general principles of equity, was entitled to have the property, including the franchises, acquired by the purchasing corporation subjected to the payment and satisfaction of such judgment. We have already, in effect, held that, in the absence of some constitutional or legislative restriction, a corporation may, in the ordinary course of business, acquire, hold, and sell its property, including its franchises, except the franchise of its existence, the same as an individual. And if it may sell a part of its property, it may, with the assent of its stockholders, sell all of it. But it is just as clear that it cannot sell, or otherwise dispose of, its property to the prejudice of its creditors any more than an individual may sell or dispose of his property to the prejudice or injury of his creditors. It was alleged, agreed, and found, that the only consideration paid by the purchasing company was the issuance and delivery of shares of its capital stock, which were distributed to the stockholders of the selling corporation. Appellant contends that a corporation may sell and transfer to another corporation all its property and secondary franchises, in consideration of shares of stock of the purchasing corporation, and that such transfer is, prima facie, for value and not fraudulent. We need not inquire into the circumstances under which the stockholders of the selling corporation may complain of such a transaction, but the circumstances under which a creditor may complain. It may be that a creditor cannot complain when the shares of stock of the purchasing corporation are received and held by the selling corporation as assets and property of the latter corporation, except on the ground that the consideration was not valuable nor adequate, upon the same ground that he might complain of any other

consideration. When the consideration is valuable and adequate, a creditor of a selling corporation, unless he is otherwise injured or prejudiced, may not complain of the transfer on the ground that the consideration received was not in cash, but was other valuable property. But we think he may very properly complain when the selling corporation and the vendee enter into an agreement or arrangement whereby all the property of the selling corporation is to be conveyed and transferred upon a consideration, whether cash, shares of stock, or other property, which is not to be paid and received as assets and property of the selling corporation, but which is to be distributed among its stockholders, and the property is so sold and the proceeds of sale so distributed. The agreed statement of facts shows that the consideration (3,062,500 shares of the capital stock of the purchasing company) expressed in the deed of conveyance was in accordance with an agreement, entered into between the two corporations, "that the shares so received from the Utah Light & Railway Company should be distributed to the shareholders in the Utah Light & Power Company, share for share, and that the stock so delivered by the Utah Light & Railway Company was so distributed to the stockholders of the Utah Light & Power Company in accordance with said agreement."

A transaction whereby one corporation sells and transfers all its property and franchises, except the franchise to be a corporation, to another corporation, upon an agreement that the proceeds or consideration of the sale should be distributed to the stockholders of the selling corporation, and where the proceeds are so distributed in accordance with such agreement entered into between the two corporations, is, as to creditors of the selling corporation, not only fraudulent, but unlawful. We have a statute which makes it a misdemeanor for any director or person, or persons, having by law the direction or management of the affairs of a corporation, "to divide, withdraw, or in any manner except as provided by law, pay to the stockholders, or any of them, any part of the capital stock of the corporation." Section

4411, Comp. Laws 1907. Capital stock, as used in this section, means "the capital of the corporation on which it transacts business, whether such capital consists of money, property, or other valuable commodities." (*Martin v. Zellerbach,* 38 Cal. 300, 99 Am. Dec. 365, we can conceive of no arrangement which would more effectually place all the property of a corporation beyond the reach of the general creditors, and which would be more to their prejudice. The selling corporation in such case "is for all purposes, outside of the winding up of its affairs, defunct," and in the condition of a dissolved corporation. (*Coler v. Tacoma Ry., etc., Co.,* 65 N. J. Eq. 347, 54 Atl. 413, 103 Am. St. Rep. 786.) In 2 Cook on Corps. section 673 (6 Ed.), the author says:

> "It is also a principle of law that a corporation buying all the property of another corporation, and paying therefor in stock of the former corporation issued to the stockholders of the latter corporation, must either pay the obligations of the latter corporation, or have the property sold to pay such obligations."

In the case of *Shadford v. Detroit, etc., Ry.,* 130 Mich. 300, 89 N. W. 960, it was held that, "where one street railway company transfers all its property to another street railway company for bonds and stock of the latter, to be distributed among the bondholders and stockholders of the former, in exchange for their bonds and stock in the former, the purchasing company is liable on the debts of the selling company; the transfer being practically a consolidation." In 2 Clark & M. on Corps., sec. 342i, the rule is stated that "a corporation which acquires the entire property of another corporation, under an agreement which has the effect of distributing the assets of the latter among its stockholders in fraud of its creditors, takes the property subject to the payment of all the debts of the vendor, including a judgment subsequently recovered against the latter in an action for negligence pending at the time of the transfer," in support of which is cited *Grenell v. Detroit Gas Co.,* 112 Mich. 70, 70 N. W.

413. To the same effect are also the following authorities and cases: 10 Cyc. 1262; *Martin v. Zellerbach, supra; Chicago, etc., Ry. Co. v. Ashling,* 160 Ill. 373, 43 N. E. 373; *Chicago, etc., Ry. Co. v. Ferguson,* 106 Ill. App. 356; *Sharples Co. v. Harding Creamery Co.,* 78 Neb. 795, 111 N. W. 783, 11 L. R. A. (N. S.) 863.

Under these circumstances, and from the further facts that the purchasing corporation was organized to acquire all the property and franchises of the selling corporation, and took possession of them and continued to prosecute the business of the selling corporation, and that some of the principal officers of the selling corporation continued to be such officers of the purchasing corporation, we are of the opinion that the property acquired by the new corporation was liable in equity to be subjected to the payment of plaintiff's judgment had against the selling corporation. We are mindful of the contention made by the appellant that the complaint does not contain any specific or direct allegation of fraud, nor is there a specific or direct finding or conclusion that the facts found constitute fraud, except that the conveyance was made without consideration, and was, as to plaintiff's claim, void and of no effect, and that the Utah Light & Railway Company was not a holder, in good faith for value without notice, of any of the property, real, personal, or mixed, acquired by it from the Utah Light & Power Company. But the facts—the essential things to be alleged and found—constituting fraud in law are specifically alleged and found. In such case it was not essential to characterize the transaction by giving it a name, or by calling it something which the law itself recognizes and names. But, aside from this question, the transaction, as found, was, according to the authorities heretofore cited, so far as affecting the rights of creditors, like that of a consolidation or a continuing corporation, rendering the purchasing company liable in equity for the debts and liabilities of the selling corporation. (*Chicago, etc., Ry. Co. v. Ferguson, supra.*) It is there said: "A consolidation, not a purchase, is effected by the transfer of the franchise and all the property of one corporation to another, under an arrangement

by which the stockholders of the former company exchange their stock for stock in the latter company."

It is further contended that the court erred in failing to find upon the issue which is claimed was raised in appellant's answer, with respect to the conclusiveness of plaintiff's judgment had against the selling corporation. The law with respect to such matter is that a judgment, rendered by a court having jurisdiction of subject-matter and of the parties, is, in the absence of a plea and proof that it was obtained by fraud or collusion, conclusive as to the relation of debtor and creditor, and the amount of the indebtedness, not only as between the parties, but also as to third parties in a subsequent suit, where such relation and indebtedness are called in question, and may not be impeached collaterally. (2 Black on Judgments, section 605; 23 Cyc. 1286; *Bensimer v. Fell,* 35 W. Va. 15, 12 S. E. 1078, 29 Am. St. Rep. 774; *Strong v. Lawrence,* 58 Iowa 55, 12 N. W. 74.) It was neither alleged nor proven that the judgment had by plaintiff against the selling corporation was obtained by fraud or collusion, or that it was rendered by a court of no competent jurisdiction. No issue being tendered on such a question, the court did not err in failing to find with respect to it. We do not say that the appellant was precluded from tendering an issue that plaintiff's original claim, and upon which his judgment was founded, was not a liability contracted or incurred in operation, use, or enjoyment of a franchise or any privilege. Such a question is not involved, for such an issue was not tendered, and the agreed statement of facts shows that the liability was incurred in the operation, use and enjoyment of the franchises conveyed and transferred.

We think the judgment of the court below ought to be affirmed. It is so ordered.

FRICK and McCARTY, JJ., concur.