CHILD et al. v. OGDEN STATE BANK et al.

No. 5392. Decided March 20, 1933. (20 P. [2d] 599.)

*Wade M. Johnson, J. C. Davis, J. A. Howell,* and *J. E. Evans,* all of Ogden, for plaintiffs.

*W. H. Reeder, Jr.,* and *Arthur Woolley,* both of Ogden, for defendants.

*L. R. Rogers,* of Salt Lake City, amicus curiae.

MOFFAT, Justice.

This is an original proceeding on the part of plaintiffs for a writ of prohibition against defendants. Upon application an alternative writ issued. To the complaint or application for the writ and the writ of prohibtion the defendants interposed a demurrer and a motion to quash. Simultaneously therewith the defendants also answered. The motion to quash is general and upon the ground of insufficient facts. The demurrer specifies two issues:

(1) "That this court has no jurisdiction to issue the writ under the circumstances set forth in the complaint and alternative writ," and (2) "That the complaint or application does not show that the defendants, and particularly the said District Court of the Second Judicial District of the State of Utah, in and for the County of Weber, and the Honorable Eugene E. Pratt, one of the judges thereof, and the said John A. Malia, Bank Commissioner of the State of Utah, and T. E. Thomas, Special Liquidating Agent of the Ogden State Bank in liquidation, have not jurisdiction to do each of the things which it is alleged in said petition, that they or either of them respectively have done and are about to do, and do not show that they or either of them have exceeded or about to exceed their jurisdiction or the jurisdiction of either of them."

The motion, demurrer, and answer were argued, and after argument were submitted.

The facts alleged and admitted, or not controverted, are substantially as follows: On February 10, 1931, plaintiff Marinda Ellen Child delivered to the Ogden State Bank the sum of $10,000. Simultaneously therewith Marinda Ellen Child and the Ogden State Bank signed the following document:

"Ogden, Utah, Feb. 10, 1931

"Trust Department Ogden State Bank

"Trust Agreement No. 596

"Marinda Ellen Child, 1549 24th St., Ogden, Utah, hereinafter known as Trustor, agrees to place in trust for her daughter and two (2) sons share and share alike, whose names are Ada C. Guilliam, daughter; William Hubert Child, son; Marcus Carterite Child, son; hereinafter known as beneficiaries, and the Ogden State Bank or its successor, a corporation with trust powers, of Ogden, Utah, known as Trustee, agrees to hold in trust Ten Thousand ($10,000.00) Dollars, which the said Trustor has this day turned over to the said Trustee, receipt of which is hereby acknowledged by said Trustee.

"Further it is agreed that said Trustor may deliver to said Trustee, from time to time, other sums of money, securities, or other form of property, as may be agreed upon between said Trustor and Trustee.

"Said Trustee agrees to use its best efforts to keep such trust funds as shall come into its hands invested in approved securities, preferably first mortgage loans, for the benefit of said Trustor, or said beneficiaries, as the case may be.

"Further it is agreed that all net income from this trust shall be held subject to the order of said Trustor, during the natural life time of said Trustor, and thereafter, subject to the order of said beneficiaries.

"Further it is agreed that said Trustor, during the natural life time of said Trustor, shall have the right to revoke this Trust, in whole or in part, and in case of revocation, said Trustee shall turn over to said Trustor, or to said Trustor's order, the securities belonging to the trust, in whole or in part as the case may be; or while under no obligation to convert such securities into cash, said Trustee may undertake to do so and expressly reserves the right to convert into cash any securities which it shall have put into the trust fund herein created. After the death of the Trustor said beneficiaries shall have the aforesaid right of revocation.

"Said trustee may loan or advance its own funds to the trust estate, or to the trustor, at prevailing rates of interest; in which case the trust estate shall be held by said trustee as security for any loans or advances so made.

"Further it is agreed that the customary trust fees shall be charged by said trustee for all its services, and on all investments other than real estate mortgages. Upon real estate mortgages the trustor or beneficiaries shall receive interest when and as collected at the rate of six (6%) per annum until further notice from the trustee, and all income on mortgages in excess of said per cent shall constitute the fees of the trustee for mortgage investments both during the life of the Trustor and thereafter.

"[Signed] Marinda Ellen Child, Trustor.
"Witness Catharine McLaughlin
"Ogden State Bank, a Corporation with Trust Powers.
"By O. J. Stilwell, Trust Officer."

The plaintiffs and applicants are beneficially interested in the trust fund referred to in said agreement.

On or about the 31st day of August, 1931, pursuant to a resolution of the board of directors of the Ogden State Bank and pursuant to law, Walter H. Hadlock, then bank commissioner of the state of Utah, as such commissioner and liquidator, took possession of the property and business of the Ogden State Bank; R. S. Jones was placed in charge; on or about October 4, 1932, Walter H. Hadlock resigned and John A. Malia became the qualified bank commissioner; thereafter R. S. Jones was succeeded as liquidating agent by T. E. Thomas; said John A. Malia and T. E. Thomas are as such bank commissioner and special liquidating agent, respectively, proceeding to liquidate the affairs of the bank; there is pending in the district court of the Second judicial district of the state of Utah, before the Honorable Eugene E. Pratt, one of the judges thereof, a proceeding entitled, "In the Matter of the Liquidation of the Ogden State Bank," file No. 12756, wherein the petitions in the liquidation of said Ogden State Bank are filed and heard by said court and the judge thereof; upon taking possession of the property and assets of the bank the commissioner filed with the

clerk of the court an inventory of the assets of the bank, other than the money and property held by the bank in trust, and a list of the claimants who were depositors of the bank and common creditors, but did not at that time file any inventory of money or property held in trust or a list of claimants thereto; on or about the 16th day of December, 1932, the said liquidators filed a list and inventory of the money and property held in trust by them, with a list of claimants; the paid-up capital stock of the Ogden State Bank was $100,000; the entire capital and surplus were exhausted prior to the closing of the bank; the liquidators now hold property which consists of notes and mortgages, and, as shown by the records and books of the bank, of a value of approximately $900,000; the liquidators in charge of the affairs of the bank have paid to the depositors (not including trust depositors) of the bank a 7 per cent dividend upon their deposits amounting to the sum of approximately $412,-000; said liquidators, John A. Malia and T. E. Thomas, have declared an additional dividend of four per cent, payable to depositors as common creditors, said liquidators have filed a petition in the proceeding entitled, "In the Matter of the Liquidation of the Ogden State Bank," No. 12756, praying that the court in which said matter is pending should determine the persons to whom such dividend should be paid; said petition came on for hearing before said court, Honorable Eugene E. Pratt sitting as one of the judges thereof; on the 5th day of January, 1933, plaintiffs through their counsel appeared and made oral objection to the hearing of said petition until the (alleged) lien of plaintiffs should be determined; plaintiffs' objections were overruled by the court, and said Honorable Eugene E. Pratt announced that he would approve the payment of said 4 per cent dividend, and direct that said dividend be paid ratably to all claimants who have claims as depositors and common creditors against the bank.

The foregoing statement constitutes all the facts alleged in the complaint and admitted by the answer, and, in ad-

dition thereto, the facts affirmatively set forth in the answer, and not denied, and while varying somewhat from the allegations of the complaint, are of such nature as to be admitted, or are so nearly identical as to be accepted by plaintiffs substantially as alleged. There is also a field of borderline allegations; some attacked as immaterial, others as being largely in the nature of conclusions, in the complaint or petition, and qualified allegations and admissions, and conclusional affirmations and admissions in the answer, difficult to classify. It appears either from these borderline expressions referred to or oral statements and admissions by counsel during argument, and documents sent to this court in pursuance of the writ and in aid thereof: That in pursuance of the trust agreement, trust No. 596, said liquidating agents claim that the fund of plaintiffs and the money so delivered to the bank was, on or about the 20th day of May, 1931, by the Ogden State Bank, set over to the bank itself as trustee for plaintiffs in the form of a certain note secured by mortgage in a sum in excess of the sum of said trust fund, and set up on the books of the bank as an overinvestment or participating interest in the security; that the security was so carried and held by the bank until the 29th day of August, 1931, when the bank paid to its trust department for trust No. 596 the sum of $10,000, and reassigned to itself and to trust No. 400 the note and mortgage theretofore on May 20, 1931, assigned to trust No. 596, and on said 29th day of August, 1931, assigned and set over to trust account No. 596 for the use and benefit of plaintiffs (allegedly in pursuance of said trust agreement) a certain note for the sum of $10,000 and a proportionate or pro rata interest in a mortgage bearing date the 22d day of December, 1930, upon property located in the state of Wyoming; that the note and proportionate part of the mortgage were held by the bank in its trust department for two or three days when the bank closed; that said note and the proportionate share of said mortgage came into, and still remains, in the hands of said liquidating

agents; that the bank commissioner as liquidating agent has been and is now ready and willing to transfer, deliver, and set over to Marinda Ellen Child (one of petitioners) or her order by proper assignment and subject to the approval of the district court, the said note and proportionate interest in said mortgage; that the liquidators of the bank on December 19, 1932, filed a petition in the district court praying that plaintiff be required to claim her property, or make such other or different claim as she might have against the bank; that the record "In the Matter of the Liquidation of Ogden State Bank," No. 12756, does not show that priority of claims or lien preferences, if any, have been determined; that there is a separate undetermined action pending in which plaintiffs seek a determination of their rights.

There are also some matters which may fairly be said to be issues of fact alleged on one side or the other, and, if not directly, at least by strong implication denied on the other, among which are: The value of the participating interest in the alleged note; whether or not the bank in attempting to invest the trust funds in the note and mortgage violated the trust agreement, and failed to faithfully perform its duties; whether or not it was necessary to bring a proceeding for an accounting; whether or not there has been an appraisement of the alleged trust property; whether or not it is necessary to determine priorities (if any exist) before the payment of the dividend in question; whether or not plaintiffs have a lien, the nature and extent thereof. What was the amount of capital and surplus, or surplus aside from invested capital, as shown by the bank's records when the liquidators took charge?

Other matters about which the parties are quite generally agreed are as to what should be done; but they are not agreed as to time or order of doing them, or procedure to pursue. Both plaintiffs and defendants seem to take the position that as to the alleged trusts, and there are some two hundred forty odd of them, there should be an accounting. Applicants insist that such should be had before any

more funds are disbursed. Applicants also insist that if the dividend is paid they will suffer loss; defendants insist otherwise. There seems to be a difference as to whether the accounting should be had in the "Liquidation Matter," or by separate proceedings. Defendants seem to take the position that all the liquidators have to do is to present an accounting, and thereupon say: "Here is your property, take it or leave it." Plaintiffs say otherwise. Both sides agree that if this court does anything other than deny the writ it should direct what should be done.

From the foregoing statement it is reasonably clear that there is only one matter upon which this court is called upon to pass, and that matter may be stated in the form of an alternative question: Should the proposed dividend be paid and leave, as among claimants, their rights, liens, or priorities, if any, to be determined afterward, or must the rights, liens, and priorities among claimants be determined before the assets of the bank, in the hands of the liquidators, are further depleted by payment of dividends?

That there are problems involved in the liquidation of the bank that call for the determination of priority of claims is clear from the foregoing statement of the positions taken by the parties hereto. Plaintiffs assert positively that such is the situation, while the defendants, among other things, say this court should instruct the trial court how to proceed.

To make the alternative writ issued in this case permanent or peremptory without some other or further suggestion is apparently not in accordance with the desires of any of the parties. What is desired is a withholding of the hand of the district court in the matter of dividends until ∎ "claims to preferences and priorities and trust relationships of various kinds growing out of divers circumstances are revealed." It is not to be expected that this court will undertake to declare the law upon any of the momentous questions involved in a complete liquidation of the Ogden State Bank. This is especially true when there are manifest issues upon which evidence must be submitted

to the trial court for determination, and to which issues of fact the law must be applied. Such a statement might be interpreted to mean that the motion to quash and the demurrer of the defendants should be sustained and the peremptory or permanent writ denied. We must not be too hasty about the matter. This case is peculiar in its origin and in the relationships involved. An examination of the statement of positions of the parties reveals a situation that calls for a type of relief more nearly analogous to the purpose of a writ of mandamus than to a writ of prohibition, and at the same time standing alone neither would bring about the desired result. That this court has the authority to issue both writs of mandamus and prohibition in such a case is manifest. Constitution of Utah, article 7, § 4; Comp. Laws Utah 1917, § 1643. It is not the title but the subject-matter of the petition or complaint and answer that reveals the questions submitted and determines the relief called for, and whether by prohibition, by mandamus, or by a combination of both. The questions presented are so related and interdependent that adequate relief may be had only by the granting of both forms of relief. We see no reason why this court should not proceed to grant such relief as will adequately protect all parties and hasten the termination of the proceedings, and bring about a promptness and expedition in the liquidation of the bank.

"The writ of prohibition is the counterpart of the writ of mandate. It arrests the proceedings of any tribunal, corporation, board, or person, whether exercising functions judicial or ministerial, when such proceedings are without or in excess of the jurisdiction of such tribunal, corporation, board, or person." Comp. Laws Utah 1917, § 7407.

The writ of prohibition arrests proceedings while the writ of mandamus, otherwise denominated a writ of mandate, compels the performance.

"It may be issued by the supreme court, or by a district court or a judge thereof, to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station; or to

compel the admission of a party to the use and enjoyment of a right or office to which he is entitled and from which he is unlawfully precluded by such inferior tribunal, corporation, board, or person." Comp. Laws Utah 1917, § 7391.

The writ of prohibition may not be converted into a mere writ of review. The writ is preventive and not corrective. Ordinarily it will not issue when there is available to the applicant a plain, speedy, and adequate remedy at law.

The order made by the trial court is interlocutory, and from which an appeal may not be taken; and, yet, if plaintiffs have a lien against all of the assets of the bank, a matter alleged but not determined, a dividend payable to depositors only, or to any other group of claimants short of all of them, would vitally affect the rights of those, the priority, or even the certainty, of whose claims had not been established or recognized. There can be no final determination of all the issues until the final liquidating order is entered.

"At any time after the expiration of the date fixed for the presentation of claims, the bank commissioner may, out of the funds remaining in his hands after the payment of expenses, declare one or more dividends, and after the expiration of one year from the first publication of notice to creditors, he may declare a final dividend, such dividends to be paid to such persons and in such amounts and upon such notice as may be directed by the district court of the county in which the office of such bank was located. Dividends due to stockholders on claims as depositors or otherwise, to the extent of the individual liability of such stockholders shall be withheld by the bank commissioner until it is ascertained that it will not be necessary to enforce their individual stock liability. The court shall make proper provision for unproved and unclaimed deposits." Laws Utah 1921, c. 23, § 10, p. 82.

Laws Utah 1921, c. 23, § 4, also provides:

"If the bank commisisoner doubts the justice and validity of any claim, he may reject the same and serve notice of such rejection upon the claimant, either by mail or personally, an affidavit of the service of such notice, which shall be prima facie evidence thereof, shall be

filed in his office. An action upon a claim so rejected may be brought within six months after such service. Claims presented and allowed after the expiration of the time fixed in the notice to creditors, shall be entitled to be paid the amount of all prior dividends thereon if there be funds sufficient therefor and share in the distribution of the remaining assets in the hands of the bank commissioner equitably applicable thereto."

It is therefore clear that at the present stage of the proceedings there is not an adequate remedy by appeal.

"This court in numerous cases has held that a judgment to be final for purposes of an appeal must dispose of the case as to all of the parties and finally dispose of the subject-matter of the litigation on the merits, or be a termination of the particular proceeding or action, or, as sometimes expressed, the case put out of court." *Oldroyd* v. *McCrea*, 65 Utah 142, 235 P. 520, 588, 40 A. L. R. 230, and cases there cited.

While the order here does not displace the plaintiffs' lien, if such exists, and we express no opinion as to that, such is a matter for determination by the trial court. All we say is the allegations make a prima facie case for some relief. The order simply ignores for the time being any claim plaintiffs may have. In the case of *Oldroyd* v. *McCrea*, supra, the situations presented in some of its features are strikingly analogous to some of those in the instant case:

"Ordinarily proceedings of receivership are protracted, and to require the state to wait until final judgment is rendered and entered in the case before it can have the rulings reviewed, its securities will be dissipated and lavished and its appeal rendered fruitless."

Quoting from *Havenmeyer* v. *Superior Court*, 84 Cal. 327, 24 P. 121, 10 L. R. A. 627, 18 Am. St. Rep. 192, Chief Justice Beatty said:

"The operation of the writ of prohibition is primarily and principally preventive, rather than remedial, and is excluded where the action of the inferior tribunal is fully completed, and nothing remains to be done under its void order; but if its action is only partially and not fully completed, further proceedings may be stayed, and in such case the office of the writ is so far remedial that it will annul such prior proceedings as may be necessary to make the remedy complete."

We need not go so far in this case. But where there are issues of fact and there is an order in which they must be determined in order to protect the interests and rights of the parties, this court sees no good reason why the proceedings which may seriously and adversely affect the rights of some of the parties, and at the same time not adversely affect the other parties, may not be stayed or held in abeyance by a writ of prohibition until other matters may be determined, and direct the whole matter to be brought orderly before the trial court for hearing and disposition in one proceeding. When rights, liens, and priorities have been determined, then proceed with the liquidation. We recognize the importance of placing reasonable restrictions upon the use of the writ of prohibition. This court has heretofore entertained applications for writs similar to the situation here. Comp. Laws Utah 1917, § 7396, reads:

"If an answer be made which raises a question as to a matter of fact essential to the determination of the motion, and affecting the substantial rights of the parties, and upon the supposed truth of the allegation of which the application for the writ is based, the court may, in its discretion, order the question to be tried before a jury, and postpone the argument until such trial can be had, and, if the proceedings are pending in the supreme court, the verdict certified to that court. The order for trial may also direct the jury to assess any damages which the applicant may have sustained, in case they find for him. If the order for trial is issued from the supreme court, it must designate the county in which the same shall be had."

This section and others in the chapter on mandamus are by Comp. Laws Utah 1917, § 7410, made applicable to proceedings for a writ of prohibition. Sufficient has been said to indicate that further proceedings must be had in the district court before a final determination of the matters in liquidation of the bank can proceed orderly and without prejudice.

By brief and argument emphasis has been placed upon the interpretation of certain statutes. The interpretation of those statutes, when the facts have been determined, may

affect the ratio and basis of distribution of the bank's assets as liquidation proceeds.

The first question presented in plaintiffs' argument is the question denominated as "self-dealing by a Fiduciary." The fiduciary relationship between the plaintiffs and the Ogden State Bank, and into the place of the latter the liquidators now find themselves (*Scott* v. *Armstrong*, 146 U. S. 499, 13 S. Ct. 148, 36 L. Ed. 1059), as indicated by the "Trust Agreement," is admitted. The question arises, Did the Ogden State Bank faithfully perform its duties with relation to that trust? This question we may not answer, but may discuss in so far as the facts are revealed for the purpose of interpreting the statutes. The dealings of the bank with these trust funds have been set forth. Conceding for the moment, without deciding, that this dealing in its own securities by the bank with itself as trustee was such a failure on its part with respect to the trust as to constitute a breach of the trust, we shall after a brief review proceed to the sections of the statutes. This type of fiduciary dealing by banks and trust companies has been exhaustively treated in an article, cited by plaintiffs, appearing in the Harvard Law Review for June, 1931, vol. XLIV, p. 1281, where the principles are set forth and the cases supporting them have been collected. There is little or no difference between the parties as to the facts and the application of the principles and authorities referred to in the Harvard Law Review article as applied to the dealings of the bank with the trust in which plaintiffs are interested, and concerning which they seek relief. The rule prohibits a party occupying the position of trustee from purchasing on his own account that which his duty or trust requires him to sell upon account of the trustors, or from selling on his own account to another for whom he is purchasing without liability of being required to account in the strictest sense therefor. *St. Paul Trust Co.* v. *Strong*, 85 Minn. 1, 88 N. W. 256. Let this premise be granted in the instant case, there still remains the question as to the extent of liability in so far

as reaching the assets of the insolvent corporation and the relative priorities of claimants thereto as among the claimants.

Plaintiffs then move forward to the next step in the argument and maintain that the bank, having violated its duties as trustee with respect to failure in faithful performance of its duties, has brought upon itself the liability imposed by statute, and submits that under the statutes when commercial banks were given authority to act as agents and fiduciaries the Legislature sought to protect those who should come into that relationship by making the claim of the fiduciary, trustor, or cestui que trust, a lien upon all of the assets of the bank superior to that of any other claim, not of the same class. The statutes referred to are: Comp. Laws Utah 1917, § 981:

"The term commercial bank, when used in this chapter, means any bank authorized by law to receive deposits of money, deal in commercial paper, or to make loans thereon, and to lend money on real or personal property, and to discount bills, notes, or other commercial paper, and to buy and sell securities, gold and silver bullion or foreign currency or bills of exchange."

Laws Utah 1921, § 981x, c. 24, p. 87, as amended by Laws Utah 1923, c. 12, page 20:

"Commercial banks, and savings banks, having a paid up capital and surplus of not less than $100,000.00 upon the issuance to the particular bank of a permit by the bank commissioner, shall have authority and power: To act as assignees, agents, receivers, guardians of the estates of minors, and incompetent persons, executors and administrators, registrars of stocks and bonds, and to execute trusts of every description not inconsistent with law."

Laws Utah 1921, § 981x1, pp. 87, 88:

"Whenever any such bank shall accept an appointment as assignee, agent, receiver, guardian, executor or administrator, or be directed to execute any trust, the capital of the said bank shall be held as security for the faithful performance of such duties, and be held liable for any default whatever, and no bond shall be required of it for the faithful performance of such trust."

If the sections of the statute just quoted apply to the situation under examination, then the only matter calling for examination and interpretation is what is meant by the word "capital," as used in Laws Utah 1921, § 981x1, supra. We are of the opinion that in this case we are not so much concerned with the particular sense in which the Legislature used the word "capital" as with the purpose and application of the sections quoted as a whole. The history of these particular sections, and the proper application of some other sections of the statute, we think, will make the situation clear.

It will be necessary to distinguish between the general powers of a corporation as provided by its articles of incorporation and its special powers conferred by particular legislative enactments. Evidently there had been corporations doing loan, trust, and guaranty business in Utah prior to the enactment of the special statute in 1890, chapter 70, p. 106, relating to such associations.

The first section of "An act to provide for the incorporation and management of Loan, Trust and Guaranty Associations" (Laws Utah 1890, c. 70), provides:

Section 1. "That loan, trust or guaranty associations which may heretofore have been incorporated, or which may hereafter be incorporated under the provisions of this act * * * shall have the power and right.

"First—* * *

"Second—To act as assignees, agents, receivers, guardians of the estates of minors and incompetent persons, executors, administrators, and to execute trusts of every description not inconsistent with the laws of this Territory or of the United States."

The last or eighth subdivision of section 1 contains a proviso:

"That before exercising any of the powers mentioned in this section, each such corporation shall have paid up of its capital not less than one hundred thousand dollars, if transacting business in cities of the first class, and not less than twenty-five thousand dollars if transacting business in cities of the second or third class, which amount

of its capital shall be paid up in money and not by the transfer of any other property, and such amount of capital shall, by such corporations be kept in money on hand or on deposit in banks or invested in first mortgages on real estate situated in Utah Territory, the amount invested in any mortgage not to exceed fifty per cent of the value of the land so mortgaged or in bonds of first or second class cities of this Territory, or in bonds of Utah Territory, or of the United States."

Section 6 of the same chapter reads:

"Whenever any such company shall receive and accept the office or appointment of assignee, receiver, guardian, executor, administrator, or to be directed to execute any trust whatever, the capital of the said company shall be taken and considered as security required by law for the faithful performance of the duties as aforesaid and shall be absolutely liable in case of any default whatever, and no bond shall be required of it for the faithful performance of such trust."

The historical development of the sections relating to corportions, and particularly loan, trust, and guaranty associations, makes it clear that, in so far as loan, trust, and guaranty associations are concerned, the capital specified in the proviso of section 1, supra, "shall be paid up in money * * * and such amount of capital shall * * * be kept" as specified in money or designated investments, and *"the capital"* referred to in Section 6 of the act *"shall be taken and considered as security required by law* for the faithful performance of the duties," and the capital "aforesaid * * * shall be absolutely liable in case of any default," refers to the same "capital." (Italics added.)

As heretofore indicated, before the passage of the law relating to "Loan, Trust and Guaranty Associations" in 1890, private corporations for general purposes and having general powers were authorized to be formed, and the usual powers and purposes as provided by law were incorporated into the agreement, charter, or by-laws at the time of formation. The rights, duties, powers, and liabilities of general corporations attached thereto. The special provisions of Laws Utah 1890, c. 70, p. 106, relating to loan, trust, and

guaranty associations, recognized that such associations may have been, before the passage of that act, organized. This is manifest from the first sentence of section 1 of the act:

"That loan, trust or guaranty associations which may *heretofore have been incorporated,* or which may hereafter be incorporated *under the provisions of this act* for the insurance of owners of real estate from loss by reason of defective titles, liens and incumbrances *or for other purposes* shall have the power and right. * * *" (Italics added).

Then follows an enumeration through eight subsections of special powers and to which a proviso is added. There are no provisions in the chapter for the incorporation of a company, so that the words, "which may hereafter be incorporated under the provisions of this act," evidently mean any corporation which may thereafter be incorporated under general law, and incorporate in its charter or corporate agreement the powers provided under the provisions of this act, shall have the power and rights, and be subject to the duties and liabilities therein imposed. This same section has been carried forward with minor verbal changes through the Revised Statutes of 1898, § 424; Comp. Laws Utah 1907, § 424; and into Comp. Laws Utah 1917, § 1201. The first sentence of section 1, Laws Utah 1890, became section 423, Revised Statutes 1898, with some changes making the general law relating to the organization of private corporations applicable, and has been carried forward and appears as follows:

Revised Statutes 1898, § 423:

"Loan, trust, and guaranty associations may be incorporated under the provisions of chapter one of this title respecting corporations for pecuniary profit; and all the rights, privileges, and powers, and all the duties and obligations of such corporations and the officers and stockholders thereof, shall be as provided in said chapter and in chapter two of this title respecting assessments, except as in this chapter otherwise provided.

Comp. Laws Utah 1907, § 423:

"Loan, trust, and guaranty associations may be incorporated under the provisions of chap. 1 of this title respecting corporations for pecuniary profit; and all the rights, privileges, and powers, and all the duties and obligations of such corporations and the officers and stockholders thereof, shall be as provided in said chapter and in chap. 4 of this title respecting assessments, except as in this chapter otherwise provided."

Comp. Laws Utah 1917, § 1200:

"Loan, trust, and guaranty associations may be incorporated under the provisions of chap. 1 of this title (§§ 860-899), respecting corporations for pecuniary profit; provided, however, that the secretary of state shall not issue a certificate of incorporation to any such association, authorizing it to do business in this state, until its articles of association or agreement shall have been approved by the bank commissioner; and all the rights, privileges, and powers, and all the duties and obligations of such corporations, and the officers and stockholders thereof, shall be as provided in said chapter and in chap. 2 of this title (§§ 900-919), respecting assessments; except as in this chapter otherwise provided."

The history and context of these provisions of the statutes make it clear that "whenever any such company shall receive and accept the office or appointment of assignee, receiver, guardian, executor, administrator, or to be directed to execute any trust whatever" (Laws Utah 1890, c. 70, § 6; Rev. St. 1898, § 426; Comp. Laws Utah 1907, § 426; Comp. Laws Utah 1917, § 1203), has reference to an appointment under a court order, and that "the capital of the said corporation shall be held as security for the faithful performance of such duties and be held liable for any default whatever," refers to the invested capital, and for the investment and protection thereof specific and restricted investment is required. This construction is further fortified by the provisions of Rev. St. 1898, § 425, and likewise carried forward with some amendments and additions to Comp. Laws Utah 1917, § 1202, part of which section reads:

"Nothing in this chapter shall be so construed as to dispense with the approval of such loan, trust, and guaranty associations as sole security by such court. * * *"

The provisions under consideration until 1921 had been limited in their application to loan, trust, and guaranty associations, and in the capacity restricted by the statute. Even though loan, trust, and guaranty associations may have the corporate powers provided by their articles of incorporation or by-laws to act as assignees, agents, receivers, guardians, etc., before they may act in the capacities indicated, in other than private matters, production of proof that they possess the qualifications enumerated must be submitted to specified state officers and their approval obtained, and power to so act may be revoked without affecting charter powers. Comp. Laws Utah 1917, §§ 1202-1206.

Until 1921, commercial and savings banks had not been authorized to execute trusts or to act in the capacities enumerated in Laws Utah 1921, § 981x, c. 24, p. 87. It reads:

"Commercial banks, having a paid up capital and surplus of not less than $100,000.00 upon the issuance to the particular bank of a permit by the bank commission, shall have authority and power: To act as assignees, agents, receivers, guardians of the estates of minors, and incompetent persons, executors and administrators, registrars of stocks and bonds, and to execute trusts of every description not inconsistent with law."

Nor had they been restricted as to private trusts, agencies, or other matters not related to court appointments. At the same time there was also passed Laws Utah 1921, § 981x1, c. 24, p. 87:

"Whenever any such bank shall accept an appointment as assignee, agent, receiver, guardian, executor or administrator, or be directed to execute any trust, the capital of the said bank shall be held as security for the faithful performance of such duties, and be held liable for any default whatever, and no bond shall be required of it for the faithful performance of such trust."

By these provisions commercial and savings banks enter the field formerly held by loan, trust, and guaranty associations. The law at present does not require commercial and

savings banks to keep their capital in money on deposit, or in bonds or securities as specified for loan, trust, and guaranty associations. Necessary liquidity makes it impractical for such banks to withdraw their capital from business in which they are engaged. It appears, however, that the law in express terms declares that such capital shall be held as security for the faithful performance of the trusts to which they are appointed and by them accepted, and in such fiduciary capacities as they accept and agree to act. These capacities are evidently intended to be related to matters over which the court has jurisdiction. The law relating to guardians, receiverships, and when it becomes necessary to appoint a trustee, except private trustee by agreement, the proceedings in relation thereto, are all subject to the jurisdiction and control of the court, and fiduciaries in such cases must be appointed by the courts. Bonds, except when such corporations as have qualified under the statute are appointed, are required to be furnished. There seems to be no provision of law preventing commercial and savings banks from acting as trustees, or in other fiduciary capacities, if the articles of incorporation so provide, upon furnishing satisfactory bond. But if they desire to serve in such capacities without bond, they must qualify as by the statute provided. Capital as used in the statute relating to loan, trust, and guaranty associations evidently means paid-up capital. The same word used in the same connection in section 981x1 must mean the same thing, therefore "capital," as used in section 981x1, means subscribed, paid-up capital.

In the instant case we have no trustee or fiduciary appointed by an order of the court. As to what the relationship of a corporation trustee under private trust bears to the trustor or cestui que trust, in relation to security, may still be important, and the exact ultimate relations of the bank to the plaintiffs may not be established until evidence has been taken and proceedings had. That the provisions of sections 981x and 981x1, supra, are

limited in their application to fiduciaries and trusts under court jurisdiction does not necessarily absolve a corporation trustee or fiduciary from liability from breach of trust, the consequences of selfdealing, fraud, or other unfaithfulness to the duties imposed. As has been indicated, the right or power of a commercial or savings bank to act as trustee does not depend in the least degree upon the provisions of section 981x if the articles of agreement provide therefor. If, however, a commercial or savings bank desires to qualify to act without bond in any of the capacities enumerated in the section in pursuance of a court appointment, then such bank must qualify as provided by the statute.

The question of liability and securities available to a trustor or cestui que trust upon a breach of a private as distinguished from a court trust must of necessity be those provided by statute, if so specifically provided, and, if not, then the general law relating to trusts and ■ trustees must apply. Commercial and savings banks and loan, trust, and guaranty companies are all formed under the general law relating to the formation or incorporation of corporations. Comp. Laws Utah 1917, § 1200, as to loan, trust, and guaranty associations; Comp. Laws Utah 1917, § 979, as to commercial and savings banks; and Comp. Laws Utah 1917, § 860, et seq., as amended, as to general incorporations, and applicable to all corporations.

Whether or not the articles of incorporation of the Ogden State Bank authorize the bank to act as trustee, accept trusts, or enter into trust agreements such as set out in the instant case, does not appear. It does appear that the bank has received from the plaintiffs $10,000, that ■ no accounting has been had, and that neither $10,000 nor the equivalent thereof has been tendered or returned. Under what is disclosed the plaintiffs have a claim either against the alleged trust property or against the assets of the bank in some form depending upon proceedings yet to be had. Whether a common creditor, a preferred creditor,

a secured creditor, a trustor with the rights arising out of the relationship of such and a trustee, or on some other ground, sufficient is disclosed to show that whatever basis upon which the claim may rest it is of such character that the court should not further permit or order the distribution or depletion of the assets in the hands of the liquidators, or for which they are as such responsible, beyond an amount sufficient to fully protect all undetermined claims, until the nature and amount have been determined. Were there no trust relationship existing under the facts alleged, the plaintiffs' claim would, under the lowest classification to which it could be put, amount to that of a common creditor, and, as such, would have a claim ratably against all the property of the bank. Comp. Laws Utah 1917, § 879.

"The property of the corporation and the unpaid stock shall be liable for the debts of the corporation." *Cooper* v. *Utah Light & Railway Co.*, 35 Utah 570, 102 P. 202, 136 Am. St. Rep. 1075.

Whether or not these trust claimants may accept the alleged trust property, that is, the note and interest in the mortgage, and regard them as a secured claim, and like all claims of creditors have their rights determined as of the date of the declaration of insolvency, then first exhaust their security and if sufficient cancel the claim, if insufficient apply the amount upon the claim and participate ratably with common creditors, is not before us for decision and we express no opinion thereon. All we do decide is that the plaintiffs have an apparent claim or interest in the assets of the bank sufficient to entitle them to have the hand of the court and of the liquidators of the bank stayed until the court has determined in the liquidation action the rights, the amounts, the priorities, the liens, if any, of all claimants, and, having done so, proceed in accordance with the said determination to distribute the amounts to the persons entitled thereto, and upon such notice as the court shall direct in the orderly liquidation of the assets of the Ogden State Bank. Laws Utah 1921, c. 23, § 10.

A peremptory writ may therefore issue, and the parties hereto proceed in accordance with the views and for the purposes herein stated. Plaintiffs and defendants each to bear their own costs.

ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.

STRAUP, Chief Justice (concurring in the result).

I concur in the result granting the writ. I, however, am of the opinion that we ought not now determine in whole or in part the scope or effect of the admitted trust between the petitioners and the bank. I think the trial court, before ordering and directing a distribution of dividends, was required to determine, as he was asked to do, the presented issues as to whether the petitioners and other claimants similarly situated by reason of the trust relation had preference rights or priorities, whether by lien or otherwise, over common creditors.

The pleadings in the case here presented, both as to the petition and the answer, are rather voluminous. Some of the allegations of the petition are admitted by the answer, some denied, and allegations of fact made upon which it is urged the writ should not issue. It is admitted that on February 10, 1931, the bank received, from the petitioner Child, $10,000 in pursuance of the "Trust Agreement" set forth in the prevailing opinion, by the terms of which the bank agreed to hold such fund in trust and to invest it in approved securities, preferably first mortgage liens, for the use and benefit of the cestuis que trustent named in the agreement. It is alleged that the bank then had, or represented to have, and as appeared by the books of the company at the time it closed its doors in August, 1931, had, "paid up capital and surplus" of $450,000; but that it in fact had no such or any capital or surplus when the bank closed its doors and was taken over by the bank commissioner. It also is alleged that when the bank closed its doors it had in trust moneys and properties in excess of

$900,000, consisting of notes and mortgages payable to the bank, constituting either first or secondary liens on real estate, which by an alleged process of self-dealing it allocated for the pretended benefit of persons interested in such trusts and trust moneys and transferred some of such notes and mortgages and moneys from the commercial department to the trust fund department, and from the trust fund department to the commercial department in such manner that the entire invested capital and surplus of the bank were exhausted. It further is alleged and not disputed that instead of investing the trust funds of the petitioners as by the trust agreement provided, the bank in May, 1931, as shown by its books, transferred to the trust account of petitioner Child a certain note and mortgage in the sum of $14,543, executed by one H. and payable to the bank, then in August, 1931, a day or two before the bank was taken over, it paid $10,000 to the trust fund of petitioner Child and reassigned, transferred, and set over to the bank the note and mortgage of H. as its property, and in lieu thereof, and as shown by the bank's books, transferred to its trust account a promissory note (unindorsed by it) in the sum of $60,000 executed by one F., due in December, 1935, secured by mortgage on real estate in Wyoming, and payable to the bank, to be allotted, partly to the petitioner Child and $50,000 thereof to other cestuis que trustent, and at the same time took moneys from its trust fund department, including $10,000 from the trust account of petitioner Child, and transferred them to its commercial fund, which moneys so transferred were used in payment of general or common creditors. And the bank commissioner now asserts that such $60,000 note and mortgage is held by him as trust property and as payment in full of the obligation of the trust fund of petitioner Child and other cestuis que trustent to whom the note and mortgage were allotted, and asks that he by direction and order of the court be required to assign, indorse, and set over such note and mortgage to such cestuis que trustent as full payment of their claims. The bank com-

missioner asserts and the plaintiffs deny that such note and mortgage are sufficient to satisfy full payment of such demands and for which the note and mortgage were so allotted. Should it be shown that such note and mortgage were acquired by the bank, not with trust funds of the petitioners, but with funds or moneys from its commercial department, and the bank the day before closing its doors transferred the note and mortgage unindorsed and unassigned by it to its trust fund department and transferred moneys out of the trust fund department to its commercial department, the further question may well arise as to whether such note and mortgage, as against common creditors, may be held and applied on payment of trust fund obligations, and as to the legal status in the premises between common creditors and trust fund claimants.

It also is alleged and not disputed that claims of common creditors aggregated over $5,600,000, and that claims involving trust funds aggregated in excess of $900,000, and that the claimants of such trust funds claimed a preference over common creditors, and that over $479,000, admittedly preferred claims of Ogden City and of divers banks, were paid by the commissioner. When the commissioner petitioned the court to pay $412,000 of dividends to common creditors, the court, over objections of the plaintiffs and of others similarly situated, directed and ordered such dividends to be distributed and paid to common creditors, which was done. Thereafter a further petition was filed by the commissioner asking direction from the court as to the payment of additional dividends of 4 per cent to common creditors, amounting in the aggregate to over $226,000. To that, the plaintiffs herein and others similarly situated objected, on the ground, among others, that the court was required first to determine the status of the plaintiffs and their rights under the trust agreement, and the scope and effect thereof. In such respect, it was shown that an action wherein the plaintiffs herein, or some of them, were plaintiffs, and the bank and bank commissioner defendants, was pend-

ing, whereby the plaintiffs sought an accounting with respect to the status of the trust fund and the rights of the petitioners under the trust agreement; and likewise it also was shown that an action brought by the bank commissioner also was pending, whereby it, in effect, was sought to require the plaintiffs and others similarly situated to set forth their claimed rights and have them determined. Among other things, it was claimed and urged by the petitioners herein and others similarly situated that by reason of their trust agreement and of section 981x, Laws Utah 1921, c. 24, they had a lien on the assets and properties of the bank, and that such liens should first be discharged out of such assets, before dividends properly could be paid to common creditors. But that was not the only claim of preference urged by the petitioners. They also urged that they were entitled to a perference because of conditions, created and arising out of the trust relation and the wrongful dealings of the bank with respect thereto, and, more especially was it urged, that before distribution of dividends to common creditors be had, they were entitled to an accounting and a determination of the status and legal effect of their claims, and to a determination of whether they, as urged by the bank commissioner, were required to look alone to the $60,-000 mortgage allotted to them, regardless of whether sufficient could be realized therefrom to pay in full the demands of the cestuis que trustent for whose benefit the bank on its books had transferred without indorsing or signing over the $60,000 note and mortgage.

As to that, the trial court ruled that no objections to the commissioner declaring a dividend would be entertained; that such matters could be arrested only by injunction proceedings; and "that the question as to whether or not the dividends could be paid was for the Bank Commissioner and not for the court to determine"; and hence overruled all objections, and ordered the dividends paid to common creditors. I am of the opinion that under the statute, while the commissioner may declare and present to the court the

matter of paying dividends, yet, that it is within the province and duty of the court to hear the matter presented, and under all the circumstances made to appear, to approve or disapprove the payment of the dividends; and, if approved, to determine to whom they are required to be paid. Even the commissioner himself for his guidance sought the advice and direction of the court with respect to the claimed preferences arising out of the trust agreements, and a determination thereof.

I think the writ should issue restraining further action of the court and of the bank commissioner paying dividends to common creditors, until the status and legal effect of the trust and the rights of the petitioners and others similarly situated are not partly, but fully, determined. Such a proceeding long ago could have been brought on for hearing and speedily could have been determined. I also am of the opinion that the issues and controversy with respect thereto should first be heard and determined by the trial court. We should not make ourselves a court of nisi prius, and in the first instance hear and determine such issues and controversies. That duty and responsibility in the first instance rests on the trial court. Above all, we in an extraordinary proceeding such as here, though requested by the parties, should not assume the function of hearing and determining for the first time the issues and controversies in question. If we may determine a part of them, then we should determine the whole of them. If we may not determine the whole, we should not determine a part. If the granting or denial of the writ depended solely upon the question of whether the petitioners, by reason of the statute referred to, section 981x, Laws Utah 1921, c. 24, had a lien on the assets and properties of the bank, and their right of preference or priority over common creditors depended alone upon the statute, then I concede a construction and application of the statute would not only be proper, but necessary, in determining whether the writ should or should not be granted. But that admittedly here is not the case. Not-

withstanding the construction given the statute by the prevailing opinion, the writ, nevertheless, is granted, and the duty and responsibility cast upon the trial court (where in the first instance it belongs) to hear and determine the status and legal effect of the trust relation, and as to whether the petitioners and others similarly situated as cestuis que trustent have or have not rights of preference or priority over common creditors.

I thus withhold my concurrence in the conclusion reached in the prevailing opinion, that none of the petitioners or others similarly situated, by reason of the statute referred to, have a lien on the assets of the bank, nor, because of the statute, any preferred rights over common creditors. And as the writ is granted and the trial court required to determine the status and legal effect of the admitted trust relation and the rights of the cestuis que trustent in the premises before directing or ordering dividends to be paid common creditors, I think the construction and application of the statute referred to should not now be determined, especially as the meaning and application thereof and as it should be applied to the cause in hand may to some extent be influenced if not made dependent upon the facts as developed upon the hearing of the issues and findings of the trial court. Further, I think it an unwise precedent to declare the law on a part of the issues of a cause before the whole of the material issues is heard and disposed of, when the part as to which the law is declared does not dispose of the cause nor end the litigation. I therefore express no opinion as to the construction or application of the statute referred to.

I think the writ should issue unconditionally restraining the action of the court and of the commissioner from further proceeding to distribute or pay dividends to common creditors, until the alleged claimed rights of preference and priority of petitioners and others similarly situated are determined. If such rights are determined in their favor, they are entitled to payment of their claims before common credi-

tors are paid. If they have no such preference or priority, and are to be regarded with no greater rights than common creditors, then they, just as much as other creditors, are entitled to participate in whatever dividends may be declared and distributed. If, on the other hand, they may not be regarded even as common creditors, and are required to look alone to their pro rata share of the $60,000 note and mortgage for full payment of their claims, regardless of the value or sufficiency of such note and mortgage to satisfy their claims, and may not look to assets of the bank for any deficiency, then again for guidance of the commissioner and in the interest of all concerned it is equally important that such a determination be had before dividends are further distributed to common creditors.